UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT HILL, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:24-cv-00400-SRC |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**Memorandum and Order**

Robert Hill moves for relief from his criminal conviction and sentence for possessing drugs with the intent to distribute them and for having been a felon in possession of a firearm. His theories for relief are legion, but his ground for relief is one:  that his attorney, Kevin Whiteley, provided him ineffective assistance of counsel on appeal.  The Court has thoroughly reviewed the record, the law, and the briefing.  And it concludes that Hill has not shown entitlement to relief or an evidentiary hearing under 28 U.S.C. § 2255.

**I.    Background**

**A.    Factual background**

After a jury found Hill guilty on two counts, Verdict, *United States v. Hill*, 4:17-cr-00310-SRC-1 (E.D. Mo. Sept. 16, 2020), doc. 418 ("Crim. doc."), the district court (the Honorable Ronnie L. White, then a judge of the United States District Court for the Eastern District of Missouri) held a sentencing hearing at which it overruled Hill's objections, crim. doc. 464, to the presentence report, *see* crim. docs. 464, 466; crim. doc. 487, Sent. Hr'g Tr. at 3:8–42:25.  The PSR describes the following facts:

1.    On September 16, 2020, [Hill] was found guilty by jury trial to a two[-]count Superseding Indictment.   Count 1 charged Conspiracy to

Distribute and Possess with Intent to Distribute Heroin and Cocaine, in violation of 21 U.S.C. § 841(b)(1)(A).  Count 2 charged Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(a)(2).

. . . .

13.    According to investigative reports of the Drug Enforcement Administration (DEA) and local law[-]enforcement agencies, beginning at a time unknown but including May 2013, and continuing until November 2016, agents conducted an investigation into an organization trafficking kilogram quantities of heroin and cocaine from Chicago, Illinois, to distributors in other states.    Through the use of confidential sources, electronic investigative techniques and physical surveillance, agents discovered [that] . . . Hill, Jorge Peralta, Jesse Akins, Sidney Mason[,] and Demond Williams, conspired together and with the Gustavo Benitez-Beltran drug[-]trafficking organization . . . and others to distribute and possess with the intent to distribute heroin, cocaine, and marijuana.

14.    The investigation ultimately resulted in the application for and activation of wiretaps on cellular telephones used by members of the conspiracy.  During the course of wiretap interceptions, investigators overheard a series of conversations during which they were able to track the transportation of heroin and cocaine from Chicago, Illinois, to St. Louis, Missouri[;] Cleveland, Ohio[;] and other areas.    Hill received multi-kilograms quantities of heroin and quantities of cocaine from the source of supply and provided the heroin and cocaine to distributors such as Akins and Mason.  Williams and Peralta acted as couriers transporting the narcotics and proceeds to and from Hill and the source of supply.

15.    On May 23, 2013, law[-]enforcement officers responded to a call for an "open door" at 11868 Criterion Avenue, St. Louis, Missouri, later identified as Hill's residence.    The caller indicated [that] the front door of the residence was open and was unsure if anyone lived in the home.  Upon arrival, officers observed the front door ajar and a large blood-stained smear on the inside glass of the front door and on the floor of the interior doorway.  Officers[, announcing their presence,] proceeded into the residence . . . in attempts to locate any possible victims.  A protective sweep of the residence revealed no persons inside; however, officers believed [that] they had entered a crime scene.  Officers observed excessive damage to walls and electronics, such as televisions, throughout the residence, and excessive amounts of blood splattered on walls, furniture, and electronics throughout the residence.  Upon entering the basement, officers detected a strong odor of marijuana emitting from a bedroom closet.  Officers located inside the bedroom a Remington model 870 12-gauge shotgun.  While making the weapon safe[,] officers noticed a small access door behind the corner of a

dresser [that] was partially blocked.  Upon moving the dresser, a Jennings .25 caliber automatic firearm (stolen) fell to the ground.  A round of ammunition and a fully loaded magazine were located in the dresser drawer. Inside the closet, officers located a small access opening containing a large secured floor safe, a Mossberg 12[-]gauge firearm with a defaced serial number, a Winchester, model 94 30-30, firearm, a Remington 12[-]gauge, model 870, firearm (stolen), a Winchester, model 24, .22 caliber rifle, a Remington 20[-]gauge, model 870, firearm, a Revelation, model 350A, 12[-]gauge firearm, a Hawthorne 12[-]gauge firearm, a Mark 2 bolt action rifle, five bullet[-]proof vests, various boxes of ammunition, camo vest accessories, 44 different knives, swords, and battle axes.

16.     A search of the floor safe revealed the additional firearms:  a Ruger P95 9mm handgun, a Sig Sauer P226 .357 firearm (stolen), a Colet [sic] 1991 .45 caliber handgun, a Kel-Tech 9mm firearm, a Taurus PT24-7 9mm handgun, a Smith & Wesson 6946 9mm handgun, a Springfield Armory XD .40 caliber firearm, a Ruger .22 caliber firearm, a Hi-Point CF380 .380 caliber firearm, a Desert Eagle .44 firearm (stolen), a Ruger P91DC .40 caliber firearm (stolen), a Sig Sauer P 230SL 9mm firearm, a Glock 17 9mm firearm, a Colt 1903 .32 firearm, a Glock 22 .40 caliber firearm, a Glock 21 .45 caliber firearm, a Smith & Wesson SW9VE 9mm firearm with a defaced serial number, a Kel-Tech .380 caliber firearm, a Jiminez Arms JA380 firearm, Traditions and Fllipietta black powder, a Glock 27 .40 caliber firearm (stolen), a Smith & Wesson SW40 VE .40 caliber firearm with a defaced serial number, a Glock 17 9mm firearm, a Smith & Wesson SW40 VE .40 caliber firearm (stolen), a Titan .25 auto firearm, a Sig Sauer P228 9mm firearm, a Taurus Raging Bull .44 mag, a Taurus Judge .45 caliber firearm, a Rossi .38 firearm, a Nef Company R92 Ultra firearm, a Smith & Wesson 27-2 .357 firearm, a Smith & Wesson SW9V 9mm firearm, a Leinad Company .45 caliber firearm, a Glock 27 .40 caliber firearm (stolen), a[n] Intra Tec Ruger Model TECDC9 9mm firearm, a Ruger GP100 .357 firearm (stolen), a Ruger P89DC 9mm firearm (stolen), a Tech 9 F7673 firearm with suppressor, a Kel-Tech PLL 9mm firearm with a defaced serial number, a Beretta A391 12[-]gauge shotgun (stolen), an Olympic Arms semi-automatic model MFR (stolen), a Norinco firearm, a Ruger mini 14 .223 firearm, four Norinco SKS 7.62 firearms (one stolen), an Eagle Almo M15A2 .223 firearm, an Ithica 127 12[-]gauge shotgun, and a Winchester 12[-]gauge shotgun.  Law enforcement officers also seized a digital video recording (DVR) device as the residence had several cameras located on the exterior of the residence and detached garage.  The firearms were analyzed by the St. Louis County, Missouri, Crime Laboratory, which revealed 63 functional firearms.  Analysis of the fingerprint evidence taken from the firearms revealed Hill's fingerprints on multiple firearms.

17.     Inside the garage of the residence officers located several vehicles, motorcycles, and vehicle components.  In an attempt to locate the owner of

the residence officers made an inquiry into a vehicle, a 1995 Ford Mustang, which reveled [that] the automobile had been reported stolen to the Hazelwood Police Department in April 2013. Also located in the garage were numerous cases of packaged alcohol reported stolen to [the St. Louis Metropolitan Police Department (SLPD)] . . . during the carjacking of a tractor trailer in St. Louis, Missouri. Specifically, the following items were located in the garage: a 2007 Honda CRF 1502 motorcycle reported stolen to [the] Berkeley, Missouri, Police Department in 2011, a 1995 Kawasaki motorcycle reported stolen to the SLMPD in 2011, a Chevrolet racing[-]style vehicle, 26 cases of Jamison, 34 cases of Kahlua, 18 cases of Jagermeister, 14 cases of Baileys, and a large box of assorted china. The residence was listed in St. Louis County, Missouri's real estate records under Hillestate Inc. which was registered to Hill.

18.    Analysis of the DVR revealed video of Hill entering the residence through the front and rear door. Hill is observed using a key to enter the detached garage. On May 22, 2013, video footage reveals [Hill] and Stacey Williams . . . in a disturbance near the front door wherein Hill punches Williams. Williams is later observed wrapping her hand in a towel leading officers to believe the blood inside the residence [was] hers.

19.    On February 28, 2014, a traffic stop was performed on a vehicle in Henry County, Indiana wherein Jorge Peralta was the driver and Gabino Aguirre was a passenger. During the stop, Aguirre provided false identification to law enforcement and a search of the vehicle located $286,409 in U.S. currency. The currency was wrapped in plastic wrap and dryer sheets in an effort to conceal the money. Aguirre admitted [that] the currency was proceeds from the sale of heroin. Peralta admitted [that] he had been hired by an individual known as "Cocho" (Faustino Benitez-Lopez) to travel from Houston, Texas to Cleveland, Ohio, to pick up drug proceeds. In order to further an investigation into drug distribution, the money was not seized.

20.    On November 7, 2014, agents learned from a CS that Peralta would be transporting a large amount of drug proceeds from Cleveland, Ohio, to Chicago, Illinois. Agents subsequently located and stopped Peralta wherein $149,050 of United States currency was located in a hidden compartment in the vehicle. During the stop Peralta provided the name "Margarito Janies" to officers.

21.    On February 19, 2016, an officer observed an extended van parked with the parking lights on, and a single occupant, later identified as Hill. Upon noticing the officer's presence Hill moved from the driver's seat to the back of the van. Believing this action to be suspicious the officer stopped to conduct a vehicle check and observed Hill hiding in the rear of the van. After several minutes Hill finally acknowledge[d] the officer's presence and appeared to have problems balancing himself in the van. After multiple

4

requests Hill provided the officer with his identity which revealed an active traffic warrant for his arrest. After approximately 20 minutes of Hill['s] failing to exit the van, bobbing his head up and down, and appearing incoherent[,] officers believed [that] he was under the influence of drugs or alcohol. Suddenly, Hill kicked open the door of the van and began to run from the officers. A foot pursuit ensued wherein Hill refused to stop [after having been] given several commands by the officer. Upon being apprehended, officers searched the backpack Hill was wearing which revealed $77,648.30 in United States currency, personal papers with names and monetary amounts (drug ledger), 1099 tax forms belonging to Willie H. Jefferson, a prescription bottle containing 20 tablets labeled Tramadol prescribed to Malcolm C. Manuel, and multiple cellular telephones. The drug ledger was analyzed by the Federal Bureau of Investigation (FBI) and was indicative of Hill's heroin sales to various distributors. Specifically, the ledger indicated [that] Hill [had] sold . . . multi-ounce quantities of heroin.

22.    Wiretap interceptions between Benitez-Lopez and Aguirre as well as interceptions between Aguirre and Hill revealed [that] Hill owed Benitez-Lopez a substantial debt for past multi-kilogram shipments of heroin. At times, Eduardo Ramirez acted as a translator in communications with Hill in order to collect debts and arrange future shipments. In April 2016, intercepted telephone calls and text messages revealed [that] Benitez-Lopez [had] arranged to send Hill five kilograms of heroin. During the calls, Aguirre informed Benitez-Lopez that Hill was ready for two kilograms; however, Benitez-Lopez said that two was not convenient and that "it has to be more than five . . . otherwise we lose too much, we don't make a dime." Later, Hill spoke with Aguirre and agreed [that] he would take four kilograms. On May 5, 2016, Benitez-Beltran and Ramirez delivered three kilograms of heroin to Hill at a safe-house location. Aguirre repeatedly spoke with Benitez-Lopez regarding obtaining the money owed by Hill for the heroin and Hill's failure to pay. In turn, Ramirez communicated with Hill regarding the drug debt owed by Hill and when Hill would be prepared to make a payment.

23.    In May 2016, via intercept communications[,] agents learned that while Hill was attempting to gather drug proceeds to pay his Chicago, Illinois[] source of supply he spoke to Akins who indicated [that] he had a customer and needed heroin. In August 2016, Hill directed Akins to an apartment building used as a safe house for drug activity. Agents reviewed multiple conversations between Hill and Akins wherein they discussed Akins getting heroin from Hill and payment for the heroin. Akins discussed putting "20 or Michael Jordan" up in a safe house referencing $20,000 to $23,000 in United States currency. During a conversation[,] Akins indicated at one time [that] he was at "47" or "49" reflecting that he owed $47,000 to $49,000 in United States currency for approximately 26 ounces of heroin.

On August 4, 2016, Akins was observed via surveillance to go [to] the Cheshire Inn, St. Louis, Missouri, to deliver[] money owed to Hill that they had previously discussed.

24.    On May 5, 2016, agents observed via surveillance two Hispanic males arrive at Hill's residence on Duke Drive, St. Louis, Missouri, and deliver three kilograms of heroin.

25.    On May 31, 2016, Hill and Benitez-Beltran discussed payment through the interpretation of Ramirez.  Specifically, Ramirez asked Hill what was going on with the "cars."  Hill indicated [that] he was waiting on customers to pay for the heroin previously distributed.  Later, Hill requested "cars with pretty paint on them" indicating [that] he wanted good[-]quality heroin to distribute in order to make up his drug debt.  Shortly thereafter . . . Hill contacted Akins and asked to borrow money to pay his Chicago, Illinois[] source of supply for a shipment of heroin.

26.    In late May and early June 2016, Hill discussed heroin purchases and payment of drug debts with Sidney Mason.  Hill was Mason's heroin supplier.  Hill and Mason discussed meeting and ultimately arranged to meet at a hookah bar in St. Louis, Missouri.  Hill arranged the meeting at the hookah bar after learning [that] Mason had a smartphone that could be tracked by law enforcement.  Following the meeting, St. Louis, Missouri, Metropolitan Police Department officers attempted to stop their vehicle.  Hill and Mason led the officers on a high-speed vehicle pursuit.  While fleeing from officers Mason threw a package from the vehicle containing approximately four ounces of heroin.  Hill and Mason made good their escape and later attempted to recover portions of the heroin.

27.    On June 5, 2016, in intercepted telephone conversations between Ramirez and Hill, made at Benitez-Beltran's direction and in his presence, Ramirez and Hill discussed whether or not Hill would have the payment for two kilograms of heroin he had previously received, plus an additional $30,000 toward the shipment he had just received in May.  On June 6, 2016, Ramirez placed an intercepted call to Hill directing Hill to make sure [that] "all the paperwork (money) is ready" so that they could transfer the ["]cars["] (heroin) "kind of fast."  Hill responded and told Ramirez to "make sure you wash them first" (bring good quality) to which Ramirez agreed.  On June 7, 2016, Ramirez and Benitez-Beltran departed Chicago in the early morning hours driving a 2007 Nissan Murano.  A subsequent traffic stop was conducted by the Illinois State Police in Normal, Illinois.  During the stop, a canine positively alerted on the vehicle for the presence of narcotics.  A search of the vehicle located two motorized secret compartments in the vehicle[:]  one behind the rear seats that ran the entire width of the vehicle and one under the center console.  Both compartments appeared to be lined with aluminum.  Law enforcement seized the vehicle and released Ramirez

and Benitez-Beltran from the scene.  Ramirez and Benitez-Beltran later traveled to St. Louis to meet with Hill and collect drug proceeds on June 12, 2016.  Intercepted calls revealed [that] Hill was not in St. Louis at the time; however, Ramirez and Benitez-Beltran were able to obtain some currency from another individual at a nightclub run by Hill.

28.    On June 17, 2016, Hill attempted to collect a drug debt from Mason.  Mason indicated [that] he wanted to return the heroin due to its poor quality.

29.    On August 22, 2016, via intercept communications agents learned [that] Hill [had] asked Shawn Fields . . . to deliver heroin.  Agents conducted surveillance on Fields and subsequently located 107.6 grams of heroin.

30.    Agents received information from a confidential source that Hill owed a source of supply in Mexico approximately one million dollars.  A CS met with Hill and Hill contested the drug[-]debt amount.  Hill requested additional heroin in order to make up the drug debt.  An undercover agent acting as a CS engaged Hill in a series of conversations where they agreed to a three-kilogram heroin deal.  On October 3, 2016, a meeting was arranged for Hill to pick up the heroin in exchange for $10,000.  Hill recruited Demond Williams to pick up the heroin.  Williams arrived at the pre-determined location and was arrested by law[-]enforcement agents.  Williams was in possession of $10,000 in United States currency and a cellular telephone given to Williams for this transaction.  A search of Williams'[s] vehicle revealed a Glock firearm.

31.    On July 27, 2017, law[-]enforcement agents executed a search warrant at the residence of . . . Hill, 2347 Gardner Drive, Moline Acres, Missouri.  The residence is one of two homes located in what agents described as a compound with a large perimeter fence obscured by high shrubbery.  The second residence address is 9977 Duke Drive.  Agents were led inside the residence by Hill's uncle, Lawrence Sanders . . . as Hill was not present.  Agents located and seized two firearms in Hill's bedroom, an American Tactical .223 caliber rifle and a Glock 17, 9mm handgun with a drug [sic] magazine; a Colt spring loaded firearm located underneath the mattress in Hill's bedroom; a Taurus 9mm handgun located inside a dresser drawer in Hill's bedroom; a Rubbermaid container containing marijuana residue located in Hill's bedroom closet; a marijuana water "bong" with marijuana residue located in an ottoman; a Kimber 9mm pistol loaded with an unknown amount of ammunition and numerous non-operable cellular telephones located in a kitchen drawer; and in the garage officers located a 2015 Dodge Challenger utilized by Hill to facilitate drug[-]trafficking crimes.  Agents also located a Missouri non-driver's license bearing Hill's picture with the name Kelvin Santiago.

32.    On July 27, 2017, law[-]enforcement agents executed a search warrant at 10127 Fieldcrest, St. Louis Missouri. Hill was observed looking outside a window of the home and was ordered out of the residence. However, Hill failed to comply, and agents breached the door and took Hill into custody without incident. A handgun was located in a bedroom closet which was claimed by Hill's girlfriend. Agents seized the firearm and two Dodge sports cars from the residence.

33.    During trial, the government presented evidence related to court[-]authorized wire interceptions between Hill and Shawn Fields (a/k/a "Hop") about "Ton" (a reference to Anthony Miller) being missing. Both "Hop" and "Ton" were listed in the drug ledger seized from Hill on February 16, 2016. Fields related that he went all over, looking for his money. During those communications, Hill indicated [that] he knew Miller kept a "spot" (reference to a stash location) on Natural Bridge Avenue, St. Louis, Missouri. At trial, . . . Aguirre testified that Miller was a distributor for Hill. On May 29, 2016, Fields called Hill and said that he had found Miller murdered at the location near Natural Bridge Avenue and sent a photograph of his corpse to Hill. Hill and Fields continued to discuss where they might be able to locate Miller's money.

34.    On August 22, 2016, calls between Hill and Fields revealed that Hill had a buyer for some of the poorer[-]quality heroin he had received from Chicago in an earlier shipment. Hill asked Fields to bring it to Hill. DEA agents conducted surveillance and observed Fields at his estranged wife's house. Fields ultimately got into his wife's vehicle[,] and DEA agents approached, recovering 105 grams of heroin from the vehicle that was bound for Hill. A consent search of the residence revealed two loaded firearms. Testimony at trial revealed that Fields [had] agreed to cooperate with DEA agents in its ongoing investigation into Hill and engaged in a multi-hour interview. Following that interview, DEA agents continued its investigation of Hill . . . Aguirre testified that Hill [had] said that Fields told him [that] Aguirre was cooperating with DEA agents. Aguirre denied helping the DEA to Hill. On October 2, 2016, Fields was murdered by gunshot.

35.    Throughout the investigation into the conspiracy, numerous firearms were located in Hill's residences. Investigation revealed [that] Hill had previously been convicted of felony charges, punishable by a term of imprisonment exceeding one year, and was thus prohibited from possessing firearms.

Crim. doc. 466 at ¶¶ 1, 13–35 (emphases removed). At sentencing, Judge White adopted

the PSR as his findings of fact. Crim. doc. 487, Sent. Hr'g Tr. at 32:22–32:25.

B.      **Procedural background**

1.      **Criminal proceedings**

The criminal proceedings at issue have a lengthy procedural history.  *See, e.g.*, crim. doc. 341 at 1–10 (recounting parts of the pretrial procedural history) (The Court cites to page numbers as assigned by CM/ECF.).  The Court does not recount it in detail here but has reviewed and is familiar with that history.

Two indictments deserve attention in this case.  The United States first indicted Hill on July 12, 2017.  Crim. doc. 1.  The United States charged Hill with two counts:  (1) conspiracy to distribute and possess with intent to distribute heroin and marijuana and (2) felon in possession of a firearm.  *Id.* at 1–2.  The United States indicted Hill on a superseding indictment on July 18, 2019.  Crim. doc. 227.  The superseding indictment charged Hill with two counts:  (1) conspiracy to distribute and possess with intent to distribute heroin, marijuana, and cocaine and (2) felon in possession of a firearm.  *Id.* at 1–2.

Five months after the superseding indictment, Hill, citing issues with his counsel, moved for leave to proceed *in propria persona*.  *See* crim. doc. 269.  Judge Shirley Padmore Mensah, United States Magistrate Judge, found that Hill "ha[d] the mental capacity to represent himself and to conduct trial on his own behalf" and that Hill "knowingly and voluntarily waived his right to be represented by counsel."  Crim. doc. 280 at 1.  Judge Mensah allowed Hill to proceed on his own but appointed Stephen Williams to serve as standby counsel.  *Id.*

Trial began at the district court on September 8, 2020.  Crim. doc. 393.  After a seven-day trial, *see* crim. docs. 393–94, 401, 409, 412–13, 417, the jury found Hill guilty on both counts, crim. doc. 418.  The district court sentenced Hill to 300 months of imprisonment followed by a five-year term of supervised release.  Crim. doc. 487, Sent. Hr'g Tr. at 40:1–40:23.

9

On January 4, 2021, Hill timely filed a notice of appeal.  Crim. doc. 477.  The Eighth Circuit, granting a motion from Williams for leave to withdraw as Hill's counsel, appointed Kevin Michael Whiteley to represent Hill on appeal.  Crim. doc. 483.  Whiteley raised three issues on appeal:  (1) the district court erred in finding that there was no purposeful discrimination in the prosecution's use of peremptory strikes, (2) the district court erred in admitting impermissible "dual-role" testimony, and (3) the evidence didn't support a finding of guilt on the felon-in-possession count.  Brief for Appellant at 22–52, *United States v. Hill*, No. 21-1026 (8th Cir. April 23, 2021).  In a published opinion, the Eighth Circuit affirmed.  *See* crim. docs. 494–95.  On March 20, 2023, the United States Supreme Court denied Hill's petition for a writ of certiorari.  Crim. doc. 502.

### 2.    Civil proceedings

In March 2024, Hill timely filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255.  Motion to Vacate, Correct Or Set Aside Sentence Pursuant to 28 U.S.C. 2255, *Hill v. United States* (E.D. Mo. Mar. 13, 2024), doc. 1 ("Civ. doc."); *see also* civ. docs. 2, 15.  Hill's initial motion spans more than 80 pages and asserts dozens of theories for section 2255 relief.  Civ. doc. 1.  On top of that, Hill supplemented his motion with additional exhibits twice.  Civ. docs. 2, 6, 8, 15.  Hill's exhibits contain affidavits from six individuals.  Civ. docs. 2-4, 6-1, 6-2, 15-1, 15-2.  The affiants claim that Hill was handcuffed and shackled at various stages of the criminal trial and sometimes in front of the jury.  *See id.*

The first affidavit, from Cassandra Sheppard, says the following:

Starting on September 8, 2020, I attended the first three days of the criminal trial of Robert Hill held in the Eastern District of Missouri.  During those three days, I seen [sic] that Robert Hill was handcuffed the whole entire time, as he defended himself in front of the jury.

Civ. doc. 2-4 at 2. Nowhere does Sheppard state that the jury saw Hill handcuffed. *Id.*

Similarly, Irish Jenkins signed an affidavit that says, "I remember Robert Hill wearing

[h]andcuffs while shifting through paper during his trial." Civ. doc. 6-1 at 2. But Jenkins does

not say that the jury could view Hill in handcuffs. *See id.*

      The next affidavit comes from Arlando Bilal. It says: "I recall the defendant walking in

trial with handcuffs on. The second [and] third day I listen [sic] over the phone. On the third I

remember hearing the defendant asking if handcuffs could be removed from his hands because

he was struggling with papers the [sic] was shuffling through." Civ. doc. 2-4 at 3. Joyce Davis

similarly stated in an affidavit: "I can verify to the fact that I witnessed Robert Hill in handcuffs

during trial. I distinctly remember him asking judge could he remove restraints from his hands

so he could retrieve some documents out of briefcase and the judge replied 'no.'" Civ. doc. 15-1

at 2. Neither Bilal's affidavit nor Davis's alleges that this exchange took place in front of the

jury, or that the jury could see the handcuffs. *See* civ.doc. 2-4 at 3; civ. doc. 15-1 at 2.

      Jacob Williams stated the following in an affidavit:

> I did in fact witness Mr. Hill in handcuffs, as well as ankle shackles, before, during,
> and after court proceedings. To my understanding this violates the constitutional
> rights of the defendant given the fact he was defending/representing himself. I
> attended 2 days and both days these were the circumstances.

Civ. doc. 15-2 at 2. Again, nowhere does Williams allege that the jury could see Hill in

handcuffs or shackles. *See id.*

      Finally, Hill's father, Robert Hill, Sr., filed an affidavit. It says: "During my son's trail

[sic] (Robert K Hill Jr) I entered the courtroom at which time I obsered [sic] my son in handcuffs

while the jury was also present in the court room [sic] in full view of the jury[] the whole time

the trial was going on." Civ. doc. 6-2 at 2.

After Hill filed his motion to vacate, the Court entered a case-management order.  Civ. doc. 5.  In it, the Court ordered the United States to answer Hill's motion, in writing, within 45 days of the date of the order.  *Id.*  The United States moved for an extension of time.  Civ. doc. 9. The Court granted the motion and ordered the United States to file its response no later than September 4, 2024.  Civ. doc. 10.

September 4, 2024, came and went, and the United States still had not filed a response. Two days after the deadline passed, the Court ordered the United States to show cause why the Court should not impose sanctions on it for failure to abide by the court-imposed deadline.  Civ. doc. 11.  The Court also ordered the United States to file its response to Hill's motion no later than September 13, 2024.  *Id.*  The United States promptly responded to the show-cause order. Civ. doc. 12.  Counsel for the United States explained that her failure to file a timely response arose from her typographical error on her motion for an extension of time and her corresponding failure to notice the new deadline.  *See id.*  The Court discharged the show-cause order.  Civ. doc. 14.  The United States filed its response, civ. doc. 19, and Hill timely filed his reply, civ. doc. 25, rendering Hill's Motion to Vacate, civ. docs. 1, 2, 6, 21, ripe for this Court's review.

## II.    Standard

### A.    Section 2255

Under section 2255, a federal prisoner "may move the court which imposed [his] sentence to vacate, set aside or correct the sentence" on the grounds that the court imposed "the sentence . . . in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).  If a petitioner claims his sentence violates the Constitution or laws of the United States, the petitioner

must establish that the violation constitutes "a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Gomez*, 326 F.3d 971, 974 (8th Cir. 2003) (first quoting *United States v. Boone*, 869 F.2d 1089, 1091 n.4 (8th Cir. 1989); and then citing Fed. R. Crim. P. 32(d) advisory committee notes to the 1983 amendments). Generally, to obtain section 2255 relief based on a claim, a petitioner must have raised the underlying error on direct appeal. *See Roundtree v. United States*, 885 F.3d 1095, 1097 (8th Cir. 2018). If a petitioner failed to do so, the Court considers the claim procedurally defaulted, rendering it ineffective in establishing a right to section 2255 relief. *See id.*

Three exceptions to this general rule exist. First, "if the error is jurisdictional, the error may be raised on collateral review without being subjected to procedural default analysis." *United States v. Mooring*, 287 F.3d 725, 727 (8th Cir. 2002). Second, if a petitioner raises a constitutional claim, the Court does not consider the claim procedurally defaulted if the petitioner shows cause for the default and actual prejudice. *See Anderson v. United States*, 25 F.3d 704, 706 (8th Cir. 1994); *Reid v. United States*, 976 F.2d 446, 448 (8th Cir. 1992). This "cause and prejudice exception does not apply to nonconstitutional or nonjurisdictional claims that could have been but were not raised on direct appeal." *Anderson*, 25 F.3d at 706 (first citing *Brennan v. United States*, 867 F.2d 111, 120 (2d Cir. 1989); and then citing *Bontkowski v. United States*, 850 F.2d 306, 313 (7th Cir. 1988)). Finally, the Court "will consider a claimed error that could have been raised at trial or on direct appeal if the alleged error was a fundamental miscarriage of justice." *Id.* (citing *Ramey v. United States*, 8 F.3d 1313, 1314 (8th Cir. 1993) (per curiam)). This exception, however, "applies only when a petitioner shows by clear and convincing evidence that, but for an alleged constitutional error, no reasonable juror would have found the petitioner guilty," *id.* at 706–07 (citing *Wallace v. Lockhart*, 12 F.3d 823, 827 (8th Cir.

1994)), and extends only to claims of factual innocence, *id.* at 707 (first citing *Narcisse v. Dahm*, 9 F.3d 38, 40 (8th Cir. 1993); and then citing *Ramey*, 8 F.3d at 1314).

If the petitioner's claims are not procedurally barred, the Court must hold an evidentiary hearing to consider the claims "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b); *see also Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir. 1994).  A petitioner is entitled to an evidentiary hearing "when the facts alleged, if true, would entitle [the petitioner] to relief."  *Payne v. United States*, 78 F.3d 343, 347 (8th Cir. 1996) (quoting *Wade v. Armontrout*, 798 F.2d 304, 306 (8th Cir. 1986)).  However, a court may dismiss a claim without a hearing "if the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." *Shaw*, 24 F.3d at 1043 (citing *Larson v. United States*, 905 F.2d 218, 220–21 (8th Cir. 1990)).

## B.    Ineffective assistance of counsel

To establish ineffective assistance of counsel, a petitioner "faces a heavy burden." *DeRoo v. United States*, 223 F.3d 919, 925 (8th Cir. 2000) (quoting *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996)).  He must show both that his counsel's performance was deficient and that the deficient performance prejudiced the petitioner's case.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *United States v. Sera*, 267 F.3d 872, 874 (8th Cir. 2001). An attorney's performance is deficient only if it falls "below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 687–88; *see also Sera*, 267 F.3d at 874.  Two substantial impediments exist to making such a showing.  First, "a 'strong presumption'" exists "that counsel's conduct falls within the wide range of reasonable professional assistance." *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (quoting *Strickland*, 466 U.S. at 689).

14

Second, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* (quoting *Strickland*, 466 U.S. at 690).

Hill raises only claims of ineffective assistance of *appellate* counsel. *See generally* docs. 1–2, 8, 15. The two-part *Strickland* test applies to ineffective-assistance-of-appellate-counsel claims. *See Bear Stops v. United States*, 339 F.3d 777, 781 (8th Cir. 2003). In an ineffective-assistance-of-appellate-counsel case, "[t]he deficient performance standard is rigorous." *United States v. Brown*, 528 F.3d 1030, 1032 (8th Cir. 2008). "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal." *Id.* (quoting *Jones v. Barnes*, 463 U.S. 745, 751 (1983)). "Therefore, absent contrary evidence, '[courts] assume that appellate counsel's failure to raise a claim was an exercise of sound appellate strategy.'" *Id.* (quoting *Roe v. Delo*, 160 F.3d 416, 418 (8th Cir. 1998)).

## III.    Discussion

### A.    Preliminary motions

Before turning to the merits of Hill's 2255 motion, the Court must first resolve other pending motions.

#### 1.    Hill's Motion for Summary Judgment

After the United States missed its original response deadline, Hill filed a Motion for Summary Judgment. Civ. doc. 13. In it, Hill argues that the Court should grant section 2255 relief because the United States failed to timely file its response to Hill's section 2255 motion. *Id.*

The Court has discretion to impose sanctions on a party that fails to meet a deadline. *See* E.D.Mo. L.R. 5.04 (stating that the Court "may" impose sanctions for failure to comply with case-management deadlines); *Dykstra v. U.S. Bureau of Prisons*, 140 F.3d 791, 796 (8th Cir.

1998) (holding that the word "'may' . . . imports discretion" (citation omitted)).  And, in some cases, those sanctions may include entry of judgment against the offending party.  E.D.Mo. L.R. 5.04.  Finding that the United States made an honest mistake when it failed to comply with the deadline, *see* civ. doc. 12, the Court discharged the show-cause order and declined to impose sanctions, civ. doc. 14.  For the same reason, the Court denies Hill's Motion for Summary Judgment, civ. doc. 13, and overrules Hill's objection to the United States's response to the show-cause order, civ. doc. 16.

### 2.    Motion to Modify the Record

Hill concedes that the trial record contains no evidence of his alleged colloquy with the district court, where Hill allegedly asked the district court, during trial and in front of the jury, to remove his handcuffs.  *See* civ. doc. 24 at 2 ("The trial record, as it exists right now, has no reference to the . . . colloquy between Hill and the district court.").  Nevertheless, Hill insists that the colloquy took place.  *See generally, e.g.*, civ. doc. 24.  And he accordingly asks this Court to modify the trial record to reflect his recollection, allegedly corroborated by Bilal's affidavit.  *See id.*

Hill relies on Federal Rule of Appellate Procedure 10(e) to support his motion.  The Federal Rules of Appellate Procedure "govern procedure in the United States courts of appeals." Fed. R. App. P. 1(a)(1).  Rule 10(e) says, in relevant part, that "[i]f any difference arises about whether the record truly discloses what occurred in the district court, the difference must be submitted to and settled by that court and the record conformed accordingly."  Fed. R. App. P. 10(e)(1).

The time for invoking Rule 10(e) has passed.  The Federal Rules of Appellate Procedure govern proceedings in the United States courts of appeals, Fed. R. App. P. 1(a)(1), not a

collateral proceeding in the district court. And Rule 10(e) requires parties seeking to challenge the district-court record to raise those challenges in the district court *before* the court of appeals conducts its direct appellate review. *See Badami v. Flood*, 214 F.3d 994, 998–99 (8th Cir. 2000) (declining to expand the record, on account of a pro se litigant's "procedural error" of having failed to "provide the district court with an opportunity to correct any errors in the record" before the appeal).

Hill argues that, because of his pro se status, the Court must look outside the framework of Rule 10(e) in deciding his motion to modify the trial-court record. *See* civ. doc. 27 at 8–9. Eighth Circuit precedent does require this Court to liberally construe all pro se filings. *See United States v. Sellner*, 773 F.3d 927, 932 (8th Cir. 2014). As such, this Court has thoroughly researched whether *any* law—not just Rule 10(e)—allows a district court, within a section 2255 case, to modify the record from the criminal trial.

To the extent that binding law has spoken on this issue, it has told this Court to deny Hill's request. For starters, the Eighth Circuit has repeatedly held that a district court can dismiss a section 2255 petition without a hearing "if the *record* affirmatively refutes the factual assertions upon which" the petitioner has based his claims. *E.g.*, *Anjulo-Lopez v. United States*, 541 F.3d 814, 817 (8th Cir. 2008) (emphasis added) (quoting *Watson v. United States*, 493 F.3d 960, 963 (8th Cir. 2007)). Sure, that rule doesn't squarely answer Hill's question. After all, Hill concedes only that the trial-court record "has no reference" to his colloquy with Judge White, doc. 24 at 2, not that the record "affirmatively" disproves Hill's contention that the colloquy didn't take place, *Anjulo-Lopez*, 541 F.3d at 817. But, if a petitioner could challenge the legitimacy of the trial-court record itself, the Eighth Circuit's rule would make no sense. If Hill is correct, then a disagreement between the record and a section 2255 petition would provide

grounds for a hearing.  The Eighth Circuit has held the opposite:  that such disputes warrant dismissal of the claim *without* a hearing.  *See id.*  From a review of these cases, the Court can tell that the trial-court record is immune from the fundamental attack that Hill seeks to level.

Additionally, this Court can find *no* case—binding or otherwise—where any court has used extrinsic evidence in a section 2255 case to undermine the legitimacy of a trial–court record.  Courts hold hearings in section 2255 cases to answer questions that fall *outside* the scope of the record.  *See, e.g.*, *Watson*, 493 F.3d at 964 (remanding for a hearing to determine whether the petitioner requested a notice of appeal from his counsel "outside the courtroom" (quoting *Machibroda v. United States*, 368 U.S. 487, 494–95 (1962))); *Koskela v. United States*, 235 F.3d 1148, 1149 (8th Cir. 2001) (remanding for an evidentiary hearing to determine the credibility of an alibi defense that trial counsel chose *not* to present to the jury).  But, for the question here— whether Hill had the colloquy with Judge White *during his trial* and in front of the jury—the record provides an answer:  it didn't happen.

To be sure, at least one court in another circuit has found that, in some circumstances, a court reporter's failure to record all proceedings in a criminal case can provide grounds for an evidentiary hearing in a section 2255 case.  The Fourth Circuit found that to be the case in *United States v. Taylor*, 303 F.2d 165 (4th Cir. 1962).  There, B.D. Taylor pleaded guilty to selling narcotic drugs and was imprisoned.  *Id.* at 165–66.  Taylor raised two grounds in his section 2255 motion:  (1) that the district court had accepted the guilty plea without first determining that Taylor entered the plea agreement voluntarily and with understanding of the nature of the charge, and (2) that the district court hadn't allowed Taylor to make a statement on his own behalf before it imposed the sentence.  *Id.* at 166.  The court reporter provided an "admittedly incomplete" record of what happened at sentencing.  *Id.* at 168–69.  The record did

*not* reflect that the sentencing court had afforded Taylor his right of allocution or that the court had accepted Taylor's guilty plea after first determining that Taylor entered it voluntarily. *Id.* at 169. The record said only that the U.S. Attorney had arraigned Taylor, a narcotics agent had testified about the illegal sale, and the court had imposed the sentence. *Id.*

On these facts, the Fourth Circuit remanded for an evidentiary hearing to fill in the gaps of what happened at sentencing. *Id.* The Court clarified that its holding did not mean "that the failure to keep complete records of the criminal proceedings is of itself an error that can be raised by a motion to vacate sentence under § 2255." *Id.* But because the records of the case were "admittedly incomplete," the merits of the petition depended "at least in part upon the memory of what took place." *Id.* That justified an evidentiary hearing because findings from the hearing would determine the outcome of Taylor's petition. *See id.* (explaining that "[i]f upon such hearing the Judge shall find that the prisoner was induced to plead guilty by reason of threats or coercion on the part of the Government's Agents[,] then the sentence should be vacated and the prisoner arraigned a second time and given the right of allocution if he pleads guilty to the charge," and that "[i]f it is found on the other hand that the rights of the prisoner, as set out in this opinion, were not violated[,] the motion to vacate the sentence should be dismissed").

Even if *Taylor* supplied binding precedent, it wouldn't justify an evidentiary hearing here because three material distinctions exist between *Taylor* and this case. First, in *Taylor*, the record supported the *petitioner's* position, not the United States'. *See id.* ("The records [did] not show that the defendant was accorded the right of allocution . . . or that the Judge accepted his plea of guilty after first determining that the plea was made voluntarily with understanding of the nature of the charge . . . ."). But here, the opposite is true. Hill contends that the record is incomplete, *see* civ. doc. 24, while the United States retorts that the record completely and

accurately reflects what happened at the trial court, *see* civ. doc. 26 at 5. That distinction makes a difference because Taylor didn't attempt to challenge the record *at all*. *See Taylor*, 303 F.2d at 169. Thus, Taylor's argument didn't call into question the principle that where the record disagrees with the petitioner's factual allegations, the record prevails, *see Anjulo-Lopez*, 541 F.3d at 817. The Court can't say the same for Hill's argument.

Second and relatedly, the *Taylor* record made its own incompleteness apparent. *See Taylor*, 303 F.2d at 168–69 (noting that the record was "admittedly incomplete" and describing the deficiencies of the court reporter's notes). So the question wasn't whether the record was incomplete—everyone already knew that it was, *see id.*—but what to do about it. Hill, arguing that an apparently complete record doesn't live up to appearances, *see* civ. doc. 24, raises a more fundamental challenge. The Court cannot reconcile that challenge with the value that Eighth Circuit precedent assigns to the record. *See Anjulo-Lopez*, 541 F.3d at 817.

Third, unlike in *Taylor*, the results of a hearing on this issue would have no impact on the merits of Hill's claims. Although Hill raises several theories for relief, he raises only one ground: ineffective assistance of counsel on direct appeal. *See* civ. docs. 1, 2, 8, 21. That ground requires the Court to assess two elements: (1) whether appellate counsel's performance fell below an objective standard of reasonableness and (2) whether the deficient performance prejudiced Hill's appeal. *See Williams v. Kemna*, 311 F.3d 895, 897 (8th Cir. 2002). To assess the first element, the Court must evaluate the performance from counsel's perspective "at the time" of the allegedly deficient performance. *Strickland*, 466 U.S. at 689. Even if the Court modified the record *now*, that wouldn't change the record that Hill's appellate counsel had to work with *then*. *See id.* ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

counsel's challenged conduct, and to evaluate the conduct *from counsel's perspective at the time*" (emphasis added)). Thus, granting Hill's motion would have no impact on the first element. *See id.* As for the second element, the Court must assess whether "but for counsel's deficient performance, the result of [Hill's] direct appeal would have been different." *Williams*, 311 F.3d at 898. The Eighth Circuit rejected Hill's appeal on April 21, 2022. *See* crim. docs. 494–95. Modifying the trial-court record now would not impact whether Hill would have prevailed on an appeal over three years ago had counsel acted differently at that time. Thus, this case differs significantly from *Taylor*, where the inadequacy of the trial-court records proved outcome-determinative to the section 2255 claims. *See Taylor*, 303 F.2d at 169.

The Court finds no legal basis for modifying the trial-court record. Thus, the Court denies Hill's Motion to Modify the Record, civ. doc. 24.

### 3. Motion to Supplement and Motion to Amend

After Hill filed his reply brief, civ. doc. 25, the United States moved to supplement its response brief, civ. doc. 26. The United States seeks to include rebuttals to two affidavits that the United States admits that it failed to address in its response brief. *See id.* at 1–4. Hill opposes the motion and moves to strike it. *See* civ. doc. 27 at 3–7. Hill contends that giving the United States a second bite at the apple would contravene both the Local Rules and the general rules of practice in federal courts. *See id.* Here, Hill has the better argument.

The Local Rules allow only three memoranda for each motion: (1) a memorandum in support of the motion, (2) a memorandum in opposition to the motion, and (3) a reply memorandum. *See* E.D.Mo. L.R. 4.01. "Additional memoranda may be filed by either party only with leave of Court." E.D.Mo. L.R. 4.01(C). "While the Court has discretion to permit a sur-reply where justice so requires, it does not allow them as a matter of course. In particular, a

'[sur-reply] is unwarranted where the reply responds to the arguments in the [response brief] and does not raise new arguments.'" *Johnson v. City of Leadington*, No. 4:19-cv-02282-SEP, 2022 WL 179218, at *10 (E.D. Mo. Jan. 20, 2022) (citation omitted).

Here, the United States only puts forth one reason why the Court should allow it to supplement its response:  that the United States "did not recognize" that Hill's petition had included the affidavits.  Civ. doc. 26 at 2.  This reason does not justify additional briefing.  *See Johnson*, 2022 WL 179218, at *10.  And since Hill did not raise any new arguments in his reply brief, the Court finds no warrant for allowing additional briefing.  *See id.*

Thus, the Court denies the United States' Motion to Supplement, civ. doc. 26.  The Court did not consider, and will not consider, the United States' supplemental arguments in its analysis of Hill's section 2255 motion or any other motion in this case.  Thus, the Court denies as moot Hill's Motion to Strike, civ. doc. 27.  Having resolved all other pending motions, the Court now turns to Hill's section 2255 motion.

## B.    Section 2255 motion

Hill argues that his appellate counsel, Whiteley, provided ineffective assistance of counsel in at least nine ways.  The Court addresses each argument in turn.

### 1.    Failing to argue that Hill was handcuffed in front of the jury

First, Hill argues that Whiteley provided ineffective assistance because Whiteley failed to argue that the district court "erred in allowing Hill to be handcuffed and shackled in front of the jury."  Civ. doc. 1 at 18.  The Court disagrees that this failure amounted to ineffective assistance of counsel.  Even assuming, without deciding, that Hill *was* handcuffed and shackled in front of the jury, this issue faced nearly impossible odds of success on appeal.  So Whiteley did not deny Hill effective assistance of counsel by failing to raise it.

For starters, had Whiteley raised this issue on appeal, he would have faced an uphill battle right out of the gate, at the standard of review. Hill admits that he failed to object when he was allegedly handcuffed and shackled in front of the jury at trial. *See* doc. 1 at 22 (admitting that "Hill, only because of his lack of legal understanding at that time, did not object to being shackled during trial"). "If a litigant believes that an error has occurred (to his detriment) during a federal judicial proceeding, he must object in order to preserve the issue." *Puckett v. United States*, 556 U.S. 129, 134 (2009). "If an error is not properly preserved, appellate-court authority to remedy the error (by reversing the judgment, for example, or ordering a new trial) is strictly circumscribed." *Id.* To prevail on an appeal of such an error, the appellant-defendant must satisfy all four prongs of the plain-error standard of Federal Rule of Criminal Procedure 52(b). *Id.* at 135. "Meeting all four prongs is difficult, 'as it should be.'" *Id.* (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 & n.9 (2004). "First, there must be an error or defect . . . ." *Id.* (citation omitted). "Second, the legal error must be clear or obvious, rather than subject to reasonable dispute." *Id.* (citation omitted). "Third, the error must have affected the appellant's substantial rights, which in the ordinary case means [that] he must demonstrate that it 'affected the outcome of the district[-]court proceedings.'" *Id.* (citation omitted). "Fourth and finally, if the above three prongs are satisfied, the court of appeals has the *discretion* to remedy the error— discretion which ought to be exercised only if the error 'seriously affect[s] the fairness, integrity[,] or public reputation of judicial proceedings.'" *Id.* (first alteration in original) (citation omitted).

"[I]t is difficult to prove ineffective assistance based upon appellate counsel's failure to raise an issue that, if raised, would have been subject to plain[-]error review." *Williams*, 311 F.3d at 897. "The decision to forgo a plain[-]error claim is usually the result of a reasonable

winnowing of weaker appellate claims." *Id.* at 897–98 (quoting *Roe*, 160 F.3d at 418).

"Therefore, [the Eighth Circuit] rarely conclude[s] that an appellate attorney's performance was constitutionally deficient for not raising such a claim." *Id.* (quoting *Roe*, 160 F.3d at 418)).

Here, Hill fails to satisfy either prong of the ineffective-assistance-of-counsel standard because the trial-court record contains no evidence that Hill was handcuffed or shackled in front of the jury. Without any factual support for the claim in the record, the issue would have fallen flat at the first prong of the plain-error standard. Indeed, "there must be an error or defect" for an appellant to satisfy the plain-error standard. *See Puckett*, 556 U.S. at 134. Since no factual predicate for the handcuffing-and-shackling issue existed in the record, Whiteley did not display "constitutionally deficient performance" by failing to raise it. *Williams*, 311 F.3d at 898. Nor did Hill suffer prejudice from the failure, as there is no "reasonable probability" that the Eighth Circuit would have done anything differently had Whiteley raised the issue on appeal. *Id.*

Sure, Hill provides six affidavits claiming that Hill was handcuffed at various stages of the trial, and sometimes in front of the jury. But even if Whiteley had known that six witnesses were, at the time of the appeal, willing and ready to corroborate Hill's claim that he was restrained in front of the jury, Whiteley would have been powerless to make a winning issue out of it. "An appellate court can properly consider only the record and facts before the district court[,] and thus only those papers and exhibits filed in the district court can constitute the record on appeal." *United States v. Brewer*, 588 F.3d 1165, 1171 n.4 (8th Cir. 2009) (quoting *Bath Junkie Branson, L.L.C. v. Bath Junkie, Inc.*, 528 F.3d 556, 559–60 (8th Cir. 2008)). And the trial-court record has no evidence of the factual allegations in the affidavits.[1]

---

[1] Purely as an aside, the Court notes a few things. In this District, the courtrooms are arranged such that the defendant sits across the courtroom from the jury; the courtrooms are outfitted with stanchions and drapes to shield shackles from the view of the jury, though members of the gallery sitting near the defense table quite likely can and do see the shackles. And, shackled defendants are moved in, around, and out of the courtroom only outside the

Hill's first ineffective-assistance-of-appellate-counsel argument asserts that Whiteley was ineffective for failing to raise an argument that was almost certainly doomed to fail. That means that Hill's ineffective-assistance-of-appellate-counsel argument is doomed to fail, too. The Court rejects it.

### 2.    Failing to argue that the Speedy Trial Act was violated

Hill argues that Whiteley provided ineffective assistance when Whiteley failed to argue that the United States and the trial court violated the Speedy Trial Act. *See* civ. doc. 1 at 27–30. The Court disagrees.

### a.    Alleged 18 U.S.C. § 3161(b) violation

Hill alleges that two agents from the Drug Enforcement Administration "approached Hill in the county jail" on May 6, 2015. *Id.* at 27. According to Hill, the DEA agents questioned him about the drug-conspiracy offense, compiled an arrest packet for his person, and secured DNA from him in an attempt to match his DNA to DNA found in a May 23, 2013, search at 11868 Criterion Avenue. *Id.* at 3, 27–28. Because the United States didn't first indict Hill until July 12, 2017, *see* crim. doc. 1, Hill concludes that the United States violated the Speedy Trial Act by failing to indict Hill within the 30-day period prescribed by 18 U.S.C. § 3161, *see* crim. doc. 1 at 27–28. But even if Hill could establish a violation of section 3161(b), he cannot establish ineffective assistance of appellate counsel because the Eighth Circuit would have rejected this argument on appeal.

Section 3161(b) says, in its entirety:

> Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges. If an

---

presence of the jury. But again, members of the public can and often do see the shackled defendant being moved. Nothing in the record before this Court suggests that an evidentiary hearing regarding these matters would be necessary or even appropriate.

individual has been charged with a felony in a district in which no grand jury has been in session during such thirty-day period, the period of time for filing of the indictment shall be extended an additional thirty days.

Eighth Circuit case law provides an important caveat. "[T]he term 'arrest' in section 3161(b) of the Act must be construed as an arrest where the person is charged with an offense." *United States v. Jones*, 676 F.2d 327, 331 (8th Cir. 1982). A defendant cannot establish a section 3161(b) violation without showing that he was "formally arrested on the federal charges" more than thirty days before the filing of an information or indictment. *United States v. Beede*, 974 F.2d 948, 951 (8th Cir. 1992).

Here, this caveat undercuts Hill's claim that the United States and the Court violated his statutory right to a speedy trial. Although Hill attaches to his section 2255 motion a DEA investigation report noting that Hill was arrested on May 6, 2015, *see* civ. doc. 2-5, Hill provides no record, or even an allegation, that he was "formally arrested on the federal charges" that formed the subject of this case on May 6, 2015, or at any other time more than 30 days before the United States filed the indictment. *Beede*, 974 F.2d at 951. Instead, the criminal docket reflects that Hill was first formally arrested on the federal charges on July 27, 2017, *see* crim. doc. 14, over two weeks *after* the indictment was filed, *see* crim. doc. 1.

Still less does Hill point to anything in the trial-court record that would support his claim. Although Hill raised the section 3161(b) issue amid the criminal proceedings, *see* crim. doc. 322 at 4, he provided no evidence or allegation that the alleged 2015 arrest was a formal arrest on the federal charges in the case. All he said was that the arrest "was related to being questioned for money laundering [and] a drug conspiracy in which defendant faces current charges." *Id.* But without a charge "by complaint or otherwise," the section 3161(b) clock didn't start. *United States v. Wearing*, 837 F.3d 905, 908 (8th Cir. 2016).

26

The trial-court record contains no evidence that the May 3, 2015 "arrest" arose from formal federal charges, so Whiteley reasonably declined to raise this issue on appeal.  Hill doesn't come close to rebutting the "strong presumption" that Whiteley's decision not to raise this issue fell "within the wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 689 (citation omitted).  The Court thus rejects Hill's argument.  *See Jones v. Barnes*, 463 U.S. 745, 754 (1983) ("For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the very goal of vigorous and effective advocacy . . . ."); *see also Fields v. United States*, 201 F.3d 1025, 1027 (8th Cir. 2000) (holding that, where a petitioner fails to satisfy either prong of the *Strickland* test, the Court "need not address the other part of the test" (citation omitted)).

### b. Alleged Speedy Trial Act violations before the superseding indictment

Hill argues that the pre-superseding-indictment proceedings violated the Speedy Trial Act and that Whiteley provided ineffective assistance of counsel by failing to raise the issue on appeal.  Civ. doc. 1 at 29.  Once again, Hill has failed to identify a reversible error that the Constitution required Whiteley to raise.

The Speedy Trial Act establishes a general rule with myriad exceptions.  In general,

> [i]n any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.

18 U.S.C. § 3161(c)(1).  Additionally, "[u]nless the defendant consents in writing to the contrary, the trial shall not commence less than thirty days from the date on which the defendant first appears through counsel or expressly waives counsel and elects to proceed pro se."  18 U.S.C. § 3161(c)(2).  But the Act excludes several "periods of delay" from the generally prescribed time

27

periods. *See* 18 U.S.C. § 3161(h). Relevantly, the Act excludes any "delay resulting from any pretrial motion." 18 U.S.C. § 3161(h)(1)(D). Additionally, the judge may grant an excludable continuance "on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial," as long as "the court sets forth, in the record of the case, either orally or in writing, its reasons" for making that finding. 18 U.S.C. § 3161(h)(7)(A).

Here, Hill argues that "90 days were not accounted for" between his arrest and the superseding indictment. Civ. doc. 1 at 29. But as Judge Mensah's analysis shows, all the time between the arrest and the superseding indictment was excludable under the Act. *See* crim. doc. 341 at 15–19. In support of the excludability, Judge Mensah made repeated and specific findings of complexity throughout the time before the superseding indictment (to which Hill did not object). *See id.*; *see also* crim. docs. 32, 42; crim. doc. 65 at 1; crim. doc. 67 at 1; crim. doc. 72 at 1. Judge Mensah's analysis on this point was so spot-on that the Eighth Circuit itself cited to Judge Mensah's Report and Recommendation to support an affirmance of a district-court order in a related, but separate case. *See United States v. Grady*, 88 F.4th 1246, 1256 (8th Cir. 2023) (citing *United States v. Hill*, No. 4:17CR310RLW(SPM), 2020 WL 4819457, at *7 (E.D. Mo. July 27, 2020)).

Given this airtight analysis and Hill's failure to object to Judge Mensah's Report and Recommendation, Whiteley's decision not to appeal this issue constituted "sound appellate strategy." *Brown*, 528 F.3d at 1033 (8th Cir. 2008) (quoting *Roe*, 160 F.3d at 418). And *Grady* resolves the prejudice prong with certainty—there is no "reasonable probability," *Strickland*, 466 U.S. at 694, that the Eighth Circuit would have reversed the same order that it later cited with approval. The Court thus rejects Hill's argument.

28

c.    **Alleged Speedy Trial Act violations after the superseding indictment**

Hill argues that 140 nonexcludable days passed after the superseding indictment issued. Civ. doc. 1 at 29.  This argument fares no better than Hill's other Speedy Trial Act arguments.

While Hill correctly states that the criminal case was no longer "complex" after the return of the superseding indictment, *see id.* at 29 (citing crim. doc. 341 at 18), he fails to rebut Judge Mensah's findings that many post-superseding-indictment days were excludable for other reasons.  Judge Mensah found that, based on Hill's request for time to file pretrial motions, Hill's motion for substitute counsel, Hill's additional request for a continuance of the pretrial-motion deadline (and Judge Mensah's "specific ends-of-justice findings"), Hill's additional pretrial motions, and the Court's COVID-19 continuance (which included specific ends-of-justice findings, *see* crim. doc. 320) fewer than 70 nonexcludable days elapsed after the superseding indictment, *see* crim. doc. 341 at 20–23.  Hill failed to object to Judge Mensah's Report and Recommendation, which means that he waived his right to appeal its factual findings.  *See* crim. doc. 352; *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990).

Whiteley's decision not to appeal this issue constituted "sound appellate strategy." *Brown*, 528 F.3d at 1033 (quoting *Roe*, 160 F.3d at 418).  And because no reversible Speedy Trial Act error exists in the record, there exists no "reasonable probability" that Hill's appeal would have come out any differently had Whiteley tried to make an issue out of it.  *Strickland*, 466 U.S. at 694.  Thus, the Court rejects Hill's argument.

### 3. Failing to argue that Hill's Sixth Amendment right to a speedy trial was violated

Hill argues that Whiteley provided ineffective assistance of counsel by not raising a Sixth Amendment speedy-trial issue with the Eighth Circuit. *See* civ. doc. 1 at 30–36. The Court disagrees.

Courts assess constitutional speedy-trial claims "on an ad hoc basis." *Barker v. Wingo*, 407 U.S. 514, 530 (1972). Four factors deserve attention: (1) the "[l]ength of delay," (2) "the reason for the delay," (3) "the defendant's assertion of his right," and (4) "prejudice to the defendant." *Id.* "Until there is some delay [that] is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id.* "Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case." *Id.* at 530–31.

First, Hill argues that the Court should consider the 2015 "arrest," discussed above, and a separate 2006 arrest as part of its speedy-trial analysis. *See* civ. doc. 1 at 31. Not so. "[N]o Sixth Amendment right to a speedy trial arises until charges are pending." *United States v. MacDonald*, 456 U.S. 1, 7 (1982); *see also United States v. Maruska*, 717 F.2d 1222, 1222 (8th Cir. 1983) (per curiam) (rejecting a criminal defendant's argument that his Sixth Amendment speedy-trial right attached at the time of an arrest without formal charges because "[t]he right to a speedy trial contained in . . . the Speedy Trial Clause of the Sixth Amendment attaches only when a defendant is arrested and formally charged with a crime"). Here, the United States first indicted Hill on July 7, 2017, crim. doc. 1, so that's when Hill's constitutional speedy-trial right first attached, *see United States v. Sprouts*, 282 F.3d 1037, 1042 (8th Cir. 2002) ("[T]he Sixth Amendment right to a speedy trial attaches at the time of arrest or indictment, whichever comes first, and continues until the trial commences").

The 38-month delay between the first indictment and trial might still amount to a "presumptively prejudicial" delay under *Barker*. 407 U.S. at 530. But that doesn't mean that Hill suffered a constitutional violation. *See United States v. Aldaco*, 477 F.3d 1008, 1019 (8th Cir. 2007) (finding no Sixth Amendment violation despite a three-and-a-half-year delay).

Judge Mensah agreed that the delay was "undeniably lengthy," but she found that the second and third *Barker* factors counseled against a Sixth Amendment violation:

> [T]he bulk of the delay, thus far, is attributable to the complexity of the case, requests by Hill and/or his co-defendants for additional time to review discovery and to file pretrial motions, Hill's late-stage request for the appointment of substitute counsel, late-stage request to proceed pro se[,] and barrage of pretrial motions. The global pandemic has undeniably raised the specter of additional delays. [But] . . . Hill's conduct and choices, not the pandemic, has been the primary driver of delays thus far. As to the third *Barker* factor, by his actions, it is apparent that (at least initially) Hill did not really want a speedy trial. Hill never objected to the complex case designation, and his retained attorneys requested a trial date in mid-August 2019, to accommodate their schedules and allow them time to prepare for trial. Even after successfully advocating to terminate his second court-appointed counsel so that he could represent himself, Hill himself requested additional extensions of the pretrial[-]motion deadline and filed additional pretrial motions, thereby further delaying and complicating pretrial proceedings. Hill did not raise the speedy[-]trial issue in earnest until June 2020, after all other pretrial matters on the superseding indictment—including an evidentiary hearing and a lengthy report and recommendation—had been completed.

Crim. doc. 341 at 27–28. Hill failed to object to the factual findings of the Report and Recommendation, leaving him powerless to challenge them later. *See Thompson*, 897 F.2d at 357.

As for the prejudice factor, Hill argues that the delay caused him anxiety and distress and that it left him unable to contact witnesses that might have provided him helpful testimony. *See* civ. doc. 1 at 34–36. Hill claims that he could not reach witnesses who "would have played a key role" in his defense because their phone numbers and addresses changed before the trial started. *Id.* at 36. But Hill does not identify any of these "witnesses" or describe what helpful

testimony he would have elicited from them.  *See id.*  Hill also points to nowhere in the

trial-court proceedings where he made a record of these factual allegations.  *See id.*  Thus, even if

they are true, they wouldn't have provided fodder for an appeal.  *See Brewer*, 588 F.3d at 1171

n.4.  And even if Hill had made a record of them, because the speedy-trial question is "ad hoc,"

*Barker*, 407 U.S. at 530, and because the second and third *Barker* factors weighed against Hill,

*see supra*, Whiteley's decision not to raise the issue fell "within the wide range of reasonable

professional assistance," *Strickland*, 466 U.S. at 689.  Thus, Hill's argument fails.

### 4.    Failing to raise evidentiary issues on appeal

Hill argues that Whiteley provided constitutionally deficient assistance by failing to

appeal certain evidentiary rulings that the district court made.  *See* civ. doc. 1 at 38–45.

Specifically, Hill contends that the district court erred when it admitted, over Hill's objection,

testimony that two of Hill's drug associates, Shawn Field and Anthony Miller, were murdered.

*See id.* at 38.  On this argument, Hill fails to satisfy the prejudice prong of the *Strickland* test.

"Appellants who challenge evidentiary rulings of the district court are like rich men who

wish to enter the Kingdom; their prospects compare with those of camels who wish to pass

through the eye of a needle."  *United States v. Glecier*, 923 F.2d 496, 503 (7th Cir. 1991) (citing

Matthew 19:24).  The Eighth Circuit reviews preserved evidentiary issues for abuse of

discretion.  *United States v. Garrett*, 103 F.4th 490, 496 (8th Cir. 2024).  "[A] district court's

evidentiary rulings are subject to harmless[-]error analysis . . . ."  *Id.* (first alteration in original)

(citation omitted).  Thus, even if the district court makes an erroneous evidentiary ruling, the

Eighth Circuit will not reverse it if the error "had little to no influence on the verdict" because

the prosecution "presented overwhelming evidence of [the defendant]'s guilt."  *United States v.*

*Love*, 521 F.3d 1007, 1010 (8th Cir. 2008).

Here, even making the generous assumption that the district court erred in its evidentiary ruling and that Whiteley performed deficiently by failing to raise the issue on appeal, the Court cannot find any basis for prejudice.  Given the "overwhelming evidence of [Hill]'s guilt" that the United States presented at trial, *Love*, 521 F.3d at 1010, Hill cannot show a "reasonable probability" that the appeal would have turned out differently had Whiteley raised the issue, *Strickland*, 466 U.S. at 694.  Thus, the Court rejects Hill's argument.

### 5.    Failure to challenge the sufficiency of the indictment

Hill argues that Whiteley performed deficiently because he failed to raise two issues related to the sufficiency of the superseding indictment.  First, Hill argues that the indictment doesn't contain enough factual matter.  *See* civ. doc. 1 at 46 (arguing that "the Indictment is bare bones").  Second, Hill argues that the indictment is "unconstitutionally vague in charging the object of the conspiracy" because the specific drugs at issue are ambiguous.  *Id.* at 47.  These issues have several flaws, so Whiteley reasonably declined to raise them on appeal.

First, Hill failed to properly preserve these issues for appeal, which means that he would have faced an uphill battle right out of the gate at the standard of review.  *See United States v. Rajab*, 23 F.4th 793, 795 (8th Cir. 2022) (holding that the Eighth Circuit will reject a challenge to an indictment not raised before trial unless the indictment "is so defective that by no reasonable construction can it be said to charge the offense" (quoting *United States v. White*, 241 F.3d 1015, 1021 (8th Cir. 2001)).  Hill hotly contests this, pointing to a pro se motion to dismiss the indictment that he filed during the criminal case.  *See* civ. doc. 1 at 45 (citing crim. doc. 251). In that 39-page filing, Hill made myriad conclusory arguments attacking the prosecution of the case against him.  *See* crim. doc. 251.  The argument that he appears to reference appears on page three.  It says: "[t]he government maliciously violated Defendant Robert Hill's 5th & 6th

33

Due Process and the right to be informed of the nature of the accusations."  Crim. doc. 251 at 3 (emphasis omitted).  The district court properly and summarily denied the motion because Hill was represented by counsel at the time, and "[t]here is no constitutional or statutory right to simultaneously proceed pro se and with benefit of counsel."  Crim. doc. 253 (alteration in original) (first quoting *United States v. Agofsky*, 20 F.3d 866, 872 (8th Cir. 1994); and then citing 28 U.S.C. § 1654).  Hill failed to preserve the issue because he didn't have any authority to preserve the issue in this manner.  *See Agofsky*, 20 F.3d at 872 (upholding a district court's decision not to rule on pro se motions when the purported pro se party was represented by counsel).

Second, the issues lack merit.  As for the first argument, "[t]he test of the sufficiency of an indictment is not whether it could not have been made more definite and certain[] but whether it contains the elements of the offense charged[] and sufficiently apprises the defendant of what he must be prepared to meet."  *United States v. Prelogar*, 996 F.3d 526, 531 (8th Cir. 2021) (quoting *United States v. Tebeau*, 713 F.3d 955, 962 (8th Cir. 2013)).  An indictment that tracks the statutory language usually suffices.  *Id.*  Here, the superseding indictment not only tracked the statutory language but also included other facts, like the timeframe and location of the offense and the specific substances at issue.  *See* crim. doc. 227.  As for the second issue, the superseding indictment was not vague as to the relevant substances.  It plainly alleged that Hill distributed and possessed with intent to distribute "a mixture or substance containing heroin and marijuana, both Schedule I controlled substances, and cocaine, a Schedule II controlled substance."  *See id.*  The superseding indictment has enough specificity.

Even the *prospect* of the daunting standard of review and the potential holes in the argument made it reasonable for Whiteley to decline to raise these issues on appeal.  Whiteley

34

exercised "sound appellate strategy," so Hill has no basis for relief or a hearing on this point. *Brown*, 528 F.3d at 1033 (quoting *Roe*, 160 F.3d at 418).

### 6.    Failure to challenge grand-jury proceedings

Hill argues that Whiteley provided ineffective assistance by failing to challenge the grand-jury proceedings that led to the superseding indictment.  Specifically, Hill claims that he "asserted that the government impermissibly issued a superseding indictment, two years [after the original indictment], without presenting evidence to the same grand jury that originally issued the first indictment."  Civ. doc. 1 at 49 (citing crim. doc. 251 at 3).  On this point, Hill is wrong on both the facts and the law.

Contrary to his allegation, Hill did not properly raise this issue during the criminal proceedings.  To support the allegation that he raised the issue during the criminal proceedings, Hill cites only to the same pro se filing that the Court discussed above.  *See id.* (citing crim. doc. 251).  As discussed above, Hill had no authority to make this filing, and, thus, he did not properly raise the issue before the Court.  Thus, the Eighth Circuit would have subjected this claim to plain-error review on appeal.  *See Puckett*, 556 U.S. at 135.  And even with a less scrutinizing standard, "[g]rand[-]jury proceedings are afforded a strong presumption of regularity, and a defendant seeking to overcome that presumption faces a heavy burden." *United States v. Fenner*, 600 F.3d 1014, 1021 (8th Cir. 2010) (quoting *United States v. Hintzman*, 806 F.2d 840, 843 (8th Cir. 1986)).  And "it is well-established that a petit jury's guilty verdict normally renders errors in the grand[-]jury proceedings harmless."  *Id.* (citations omitted).  Right out of the gate, even without taking anything for granted on the merits of the argument, this issue was a long shot on appeal.

And, with the merits considered, the odds become even longer, for two reasons.  First, Hill has no support for his argument that "when issuing a superseding indictment, the [United States] is obligated to present evidence to the same grand jury that issued the original indictment, so as to prevent the government from impermissibly misleading a new grand jury to indict merely because another grand jury had already issued the first indictment."  Civ. doc. 1 at 50.  Hill cites only one case, *United States v. Reyes*, 921 F. Supp. 189 (S.D.N.Y. 1996), to support this proposition.  And in that out-of-circuit district-court case, the court ordered the United States to produce attendance and voting records of the grand jury that issued the superseding indictment *not* because the later grand jury was made up of different people than the original one but on account of the prospect that some of the grand jurors that issued the superseding indictment did not hear all the evidence on which the indictment was based.  *See Reyes*, 921 F. Supp. 189.  Second, Hill can point to nothing in the record to support grand-jury irregularity.

The grand-jury argument would not have survived on appeal.  Whiteley reasonably declined to raise it, and there exists no "reasonable probability" that the appeal would have come out any differently had Whiteley raised it.  *Strickland*, 466 U.S. at 689, 694.  Hill's argument fails both prongs of the *Strickland* test.  *See id.*

### 7.    Failure to raise Fourth Amendment issues

Hill argues that Whiteley performed deficiently by failing to appeal denials of motions to suppress evidence.  Civ. doc. 1 at 52–64.  The Court disagrees.  Whiteley made a reasonable decision not to appeal the trial court's denials of Hill's motions to suppress.

### a.     2013 search and seizure at 11868 Criterion Avenue

### i.     Initial warrantless search and seizure

Hill first argues that Whiteley should have appealed the denial of Hill's motion to suppress evidence that St. Louis County Police recovered from the initial, warrantless search of the residence.  Civ. doc. 1 at 52–57.  But it wasn't unreasonable for Whiteley to decline to raise this claim on appeal because it would have been a weak issue to appeal.

Judge Mensah rejected Hill's motion to suppress in a Report and Recommendation, *see* crim. doc. 303, and Judge White adopted the Report and Recommendation, *see* crim. doc. 318.  Hill didn't object to the Report and Recommendation, leaving him powerless to challenge its factual findings.  *See* doc. 318; *Thompson*, 897 F.2d at 357.  Inconveniently for Hill, "[t]he reasonableness of any exigency-based search requires a highly fact-intensive inquiry."  *United States v. Goodrich*, 739 F.3d 1091, 1097 (8th Cir. 2014).

Exigent circumstances can justify a warrantless search if the officer has "an 'objectively reasonable' concern 'for the safety of themselves or others.'"  *United States v. Williams*, 77 F.4th 1197, 1199 (8th Cir. 2023) (quoting *United States v. Kuenstler*, 325 F.3d 1015, 1021 (8th Cir. 2003)).  They can justify a warrantless seizure, too.  *United States v. Shrum*, 59 F.4th 968, 972 (8th Cir. 2023).

Here, Judge Mensah found (again, without objection from Hill) that the officers searched the residence after finding evidence of a violent struggle.  *See* crim. doc. 303 at 8–10.  Judge Mensah found that the officers searched some of the more hidden areas of the residence "[b]ecause of all of the blood and damage [that] they had observed . . . and because [they weren't] sure whether someone might be hiding in the house."  *Id.* at 9.  And Judge Mensah

found that the officers temporarily seized multiple weapons from the bloody residence for safekeeping and inventory. *Id.*

In the face of these unopposed factual findings, and the "highly fact-intensive" nature of the exigent circumstances test, *Goodrich*, 739 F.3d at 1097, Whiteley did not perform unreasonably when he declined to appeal this issue.

### ii.    Post-warrant search and seizure

Hill also argues that, even after officers obtained a warrant, the warrant did not authorize the seizure of firearms or ammunition. Civ. doc. 1 at 57. Hill also argues that the warrant was tainted by illegally obtained evidence. *Id.* at 58–60. To both, not so.

On the first issue, the particularity requirement of the Fourth Amendment imposes "a standard of practical accuracy rather than a hypertechnical one." *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011) (quoting *United States v. Thurman*, 625 F.3d 1053, 1057 (8th Cir. 2010)). In *Fiorito*, the Eighth Circuit upheld, as sufficiently specific, a warrant that authorized a search for "[e]ntire files involving [the defendant], including but not limited to copies of all deeds, mortgages, promissory notes, [and] contracts for deed." *Id.* Here, the warrant authorized the seizure of drugs, paraphernalia, and "notes or ledgers pertaining to the illegal sales of narcotics, including the presence of weapons." Crim. doc. 303 at 10. This level of specificity matches the level of specificity in *Fiorito*. *See* 640 F.3d at 346. Thus, Whiteley made a reasonable decision not to appeal this issue.

On the second issue, Hill says that (1) an unconstitutional canine sniff and (2) an outside-the-scope-of-the-exigent-circumstances search of a detached garage led to the search warrant, so the search warrant was tainted. Civ. doc. 1 at 58–60. But Judge Mensah found, as an unopposed factual finding, that one of the officers "noticed a strong odor of marijuana" before

38

the canine ever even entered the picture.  Crim. doc. 303 at 9.  This would have sufficed to demonstrate probable cause independently of the canine sniff.  *See United States v. Perez-Trevino*, 891 F.3d 359, 367 (8th Cir. 2018).  As for the search of the garage, the Eighth Circuit likely would have agreed that the community-caretaking exception to the warrant requirement applied, so the evidence from the garage used to support probable cause was not illegally obtained.  *See United States v. Smith*, 820 F.3d 356, 360 (8th Cir. 2016) ("A police officer may enter a residence without a warrant as a community caretaker where the officer has a reasonable belief that an emergency exists requiring his or her attention" (quoting *United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006)).  Thus, it was reasonable for Whiteley to decline to raise this issue on appeal.

### b.    2016 search of Hill's backpack

Hill argues that Whiteley provided defective assistance when he failed to appeal the denial of Hill's motion to suppress evidence from a 2016 search of Hill's backpack.  Civ. doc. 1 at 60–64.  Hill contends that Judge Mensah erred because she applied *United States v. Perdoma*, 621 F.3d 745, 753 (8th Cir. 2010), instead of *Arizona v. Gant*, 556 U.S. 332 (2009).  *Id.*  Not so.

At least two cogent reasons support Judge Mensah's decision to follow *Perdoma* and, in turn, Whiteley's decision not to appeal the issue.  First, *Perdoma* came after *Gant*.  *See United States v. Donath*, 107 F.4th 830, 837 (8th Cir. 2024) ("An older Supreme Court decision does not overcome the binding nature of a newer opinion filed by a three-judge panel of [the Eighth Circuit]." (citing *McCullough v. AEGON USA, Inc.*, 585 F.3d 1082, 1085 (8th Cir. 2009))).  Second, *Perdoma* dealt with on-point facts, while *Gant* dealt with distinguishable ones.  *Perdoma*, like this case, dealt with the search of a subject's bag after the person was handcuffed.  *See* 621 F.3d 745–46.  In contrast, *Gant* dealt with an automobile search.  *See generally* 556 U.S.

39

332. Whiteley reasonably declined to raise this issue on appeal, given the adverse precedent in *Perdoma* and Hill's decision not to object to Judge Mensah's Report and Recommendation. Thus, Whiteley's decision not to appeal the Fourth Amendment issues did not constitute ineffective assistance of counsel.

### 8.    Failure to argue for dismissal of indictment

Hill originally had a co-defendant named Jesse Akins.[2]  *See* crim. doc. 1 at 1.  Hill contends that the Court granted Akins's motion to dismiss and that the Court wrongfully denied Hill's request to join Akins's motion.  Civ. doc. 1 at 64.  Hill says that this denial violated an April 9, 2020 order that, Hill alleges, "established that codefendants in cases automatically reap the benefits of the outcome of motions filed by codefendants, unless that defendant expressly opts out of adopting the motion."  *Id.* (citing doc. 304 at 4–5).  Finally, Hill claims that Whiteley provided ineffective assistance by failing to appeal the issue.  *Id.* at 65–67. The underlying argument—not even to mention the ineffective-assistance-of-counsel argument—is beyond frivolous.

First, the Court never granted a motion to dismiss Akins's indictment.  Instead, the United States *voluntarily* dismissed the charges against Akins.  *See* Motion to Dismiss Indictment Against Defendant Jesse Akins Only at 1, *United States v. Akins*, No. 4:17–cr–00310–RLW–3, doc. 431 (E.D. Mo. Oct. 1, 2020).

Second, the April 9, 2020 order doesn't say what Hill claims that it says.  The order says the following about the multiple-defendants issue:

> *From and after the moment the case is called for trial*, any objection, motion[,] or other application for relief made by any defense counsel orally, or in writing, shall be deemed to be adopted and joined in by every other defendant, respectively, without announcement by counsel to that effect.  Similarly, the rulings of the Court

---

[2] Hill spells the co-defendant's last name "Adkins."  *See, e.g.*, civ. doc. 1 at 64.  But because the trial-court record spells it "Akins," *see, e.g.*, crim. doc. 1 at 1, that's how the Court will spell it in this order.

> thereon shall be deemed applicable to each defendant unless otherwise stated at the time the ruling is made. Accordingly, it shall be regarded as unnecessary and improper for counsel to rise to "join in" an objection or motion. Rather, counsel should rise to be heard **only** for the purpose of expressly opting out of an objection or motion if that is their position.

Crim. doc. 304 at 4–5 (first emphasis added). This part of the order plainly applies only to motions made after the case is called for trial. *See id.* And none of Akins's motions to dismiss, even if the Court *had* granted them, came before trial.

Third, on account of the frivolity of the underlying issue, Whiteley did not act unreasonably by failing to raise it on appeal. And the appeal would have gone no differently had Whiteley raised this issue. Hill can satisfy no part of the ineffective-assistance-of-counsel test.

### 9.    Failure to appeal sentencing issues

Finally, Hill argues that Whiteley provided ineffective assistance of counsel by declining to raise a host of issues related to Hill's sentencing. Civ. doc. 1 at 67–82. The Court sorts these challenges into two categories: (1) Whiteley's decision not to challenge the Court's findings on drug quantities for purposes of the relevant-conduct analysis and (2) Whiteley's decision not to challenge the Court's consideration of a prior conviction for assault that Hill claims wasn't his. *See id.* On neither point can Hill establish ineffective assistance of appellate counsel.

#### a.    Failure to challenge drug-quantity findings

Hill claims that the trial court erred when it assigned a base offense level of 38 because the trial court didn't properly find that Hill's offense involved at least 90 kilograms of heroin. *Id.* at 67–75. Whiteley reasonably declined to appeal this issue because of the long odds of a meaningful victory on appeal.

"To arrive at the appropriate sentencing range for a drug defendant, it is invariably necessary for the district court to reference the 'relevant conduct' provisions of the United States

41

Sentencing Guidelines." *United States v. Strange*, 102 F.3d 356, 359 (8th Cir. 1996) (citation

omitted). "[A] district court may use a defendant's relevant conduct in sentencing if it finds by a

preponderance of the evidence that the conduct occurred." *United States v. Tyndall*, 521 F.3d

877, 883 (8th Cir. 2008) (citations omitted). If a criminal defendant appeals the district court's

determination of the amount of drugs attributable to him, the Eighth Circuit "will reverse only if

the district court committed clear error when ascertaining drug quantity." *Strange*, 102 F.3d at

359 (citation omitted).

Here, Whiteley reasonably declined to appeal this issue because he could have reasonably

believed that the trial court committed no error when it determined the base offense level. The

Court carefully reviewed the trial record, and the record supports the trial court's drug-quantity

determination. Multiple pieces of evidence support the determination, including the amounts of

money uncovered as part of the investigation and Hill's own incriminating statements. Whiteley

did not perform deficiently here.

### b.      Failure to challenge use of assault conviction at sentencing

Finally, Hill argues that Whiteley performed ineffectively when he failed to appeal the

trial court's decision to attribute three additional points to Hill's criminal-history category. Civ.

doc. 1 at 76. Specifically, Hill contends that the PSR listed a criminal conviction for an assault

that Hill did not commit. *Id.*

In his section 2255 motion, Hill takes issue with two paragraphs of the PSR: paragraphs

67 and 73. Paragraph 67 adds one point to Hill's criminal-history score for a third-degree assault

that, according to the PSR, Hill committed in 2015. Crim. doc. 466 at ¶ 67. And paragraph 73

adds two more points to Hill's criminal-history score because Hill committed the instant offense

"while under a criminal justice sentence" for the same third-degree assault. *Id.* at ¶¶ 67, 73. In

his section 2255 motion, Hill contends that a different "Robert Hill" committed the assault.  Civ. doc. 1 at 76.  And he attaches as an exhibit the state-court docket sheet for the assault case, which purportedly shows that the defendant in the assault case had a different middle name, address, and date of birth than Hill.  *See* civ. doc. 2-8.

Before sentencing, Hill filed eight pages of objections to the PSR.  One objection related to Hill's criminal history, and it said, in its entirety:  "The Defendant objects to paragraph[s] 64, 66, & 68 of PSIR, those allege [sic] convictions were used to apply a three-point enhancement." Crim. doc. 464 at 4.  Paragraphs 64, 66, and 68 of the Disclosure PSR (which Hill was referencing in his objections) correspond to paragraphs 63, 65, and 67 in the PSR.  *See* crim. doc. 458 at ¶¶ 64, 66, 68; crim. doc. 466 at ¶¶ 63, 65, 67.  Each of those paragraphs added one point to Hill's criminal-history score:  the first for a drug-paraphernalia-possession offense, the second for failure to pay child support, and the third for the assault.  *See* crim. doc. 466 at ¶¶ 63, 65, 67. Nowhere in Hill's objections did he contend that he did not commit the assault or that a mistake in identity occurred.  *See generally* crim. doc. 464.

At sentencing, the Court took up Hill's objections and gave Hill the opportunity to argue them.  *See, e.g.*, crim. doc. 487, Sent. Hr'g Tr. at 3:8–3:9, 6:21–7:3.  When it came time to discuss Hill's criminal-history objections, Hill, echoing his written objections, said:  "[t]he Defendant objects to paragraphs 64, 66 and 68 of the PSI, those alleged convictions that were used to apply three points."  *Id.* at 28:18–28:20.  In response, the United States argued that Hill "raise[d] no legal reason why these convictions [did] not belong to him" and that he had "no legal attack to the assessment of points."  *Id.* at 29:19–29:20.  The Court overruled Hill's objections.  *Id.* at 29:24–29:25.

Because Hill failed to develop his argument, Whiteley reasonably declined to raise this issue on appeal. The Eighth Circuit "has repeatedly held that unless a defendant objects to a specific factual allegation contained in the PSR, the court may accept that fact as true for sentencing purposes." *United States v. Rodriguez*, 711 F.3d 928, 939 (8th Cir. 2013) (quoting *United States v. Montgomery*, 701 F.3d 1218, 1223 (8th Cir. 2012)). "Thus, a defendant's failure to object to the PSR's factual characterization of his conduct is dispositive." *Id.* (quoting *United States v. Oaks*, 606 F.3d 530, 542 (8th Cir. 2010)). "Vague and blanket objections lacking specific clarity are not sufficient." *Id.* (quoting *United States v. Davis*, 583 F.3d 1081, 1096 (8th Cir. 2009)). Here, Hill made only a "[v]ague and blanket objection[]" to the criminal-history portions of the PSR, so the Eighth Circuit likely would have rejected Hill's argument on appeal. *See id.* And since the Eighth Circuit likely would have rejected Hill's argument, there exists no reasonable probability that the appeal would have come out differently had Whiteley raised this issue. Thus, all of Hill's ineffective-assistance-of-counsel arguments fail.

## IV.    Certificate of appealability

For the Court to issue a certificate of appealability, Hill must make a substantial showing that he suffered the denial of a constitutional right. *See Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997). A substantial showing means one indicating that reasonable jurists could debate the issues, a court could resolve the issues differently, or the issues deserve further proceedings. *Id.* But as shown in the discussion above, Hill has not made such a showing. Accordingly, the Court declines to issue a certificate of appealability in this case.

## V.    Conclusion

For these reasons, the Court denies Hill's [1] Motion to Vacate, Correct Or Set Aside Sentence. The Court denies Hill's [13] Motion for Summary Judgment. The Court denies Hill's

[24] Motion to Modify the Record.  The Court denies the United States's [26] Motion to Supplement and denies as moot Hill's [27] Motion to Strike.  A separate order of dismissal accompanies this Memorandum and Order.

So ordered this 14th day of July 2025.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE